GOLD SEAL LIQUORS, INC., AND GOLD SEAL LIQUORS, INC., AS TRANS-
FEREE, AND ACQUIRING CORPORATION BY CONSOLIDATION OF GOLD
SEAL LIQUORS, INC., AND FAMOUS LIQUORS, INC., PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 35403.   Filed May 28, 1957.

*Philip B. Heller, Esq.*, for the petitioner.
*David H. Nelson, Esq.*, and *Julian L. Berman, Esq.*, for the
respondent.

472

OPINION.

RAUM, *Judge:* Petitioner contends that it is entitled to excess profits tax relief under section 722 (b) (4) of the Internal Revenue Code of 1939.[1] In two of the years for which relief is claimed—the years ending January 31, 1941, and January 31, 1942—Component Gold Seal was in existence, and petitioner's claim for those years relates to that corporation.[2] For the ensuing years ending January 31, 1943 through 1946, its claim for relief relates to itself as an "acquiring

---

[1] SEC. 722. GENERAL RELIEF—CONSTRUCTIVE AVERAGE BASE PERIOD NET INCOME.

(b) TAXPAYERS USING AVERAGE EARNINGS METHOD.—The tax computed under this subchapter (without the benefit of this section) shall be considered to be excessive and discriminatory in the case of a taxpayer entitled to use the excess profits credit based on income pursuant to section 713, if its average base period net income is an inadequate standard of normal earnings because—

\* \* \* \* \* \* \*

(4) the taxpayer, either during or immediately prior to the base period, commenced business or changed the character of the business and the average base period net income does not reflect the normal operation for the entire base period of the business. If the business of the taxpayer did not reach, by the end of the base period, the earning level which it would have reached if the taxpayer had commenced business or made the change in the character of the business two years before it did so, it shall be deemed to have commenced the business or made the change at such earlier time. For the purposes of this subparagraph, the term "change in the character of the business" includes a change in the operation or management of the business, a difference in the products or services furnished, a difference in the capacity for production or operation, a difference in the ratio of nonborrowed capital to total capital, and the acquisition before January 1, 1940, of all or part of the assets of a competitor, with the result that the competition of such competitor was eliminated or diminished. Any change in the capacity for production or operation of the business consummated during any taxable year ending after December 31, 1939, as a result of a course of action to which the taxpayer was committed prior to January 1, 1940, or any acquisition before May 31, 1941, from a competitor engaged in the dissemination of information through the public press, of substantially all the assets of such competitor employed in such business with the result that competition between the taxpayer and the competitor existing before January 1, 1940, was eliminated, shall be deemed to be a change on December 31, 1939, in the character of the business, \* \* \*

[2] Under Illinois law, all components to a statutory consolidation cease to exist upon effectuation of the consolidation. The resulting corporation succeeds to all rights, duties, privileges, and immunities of its components. Business Corporation Act of July 13, 1933, Ill. Rev. Stat. ch. 32, sec. 157.69 (a) through (e) (1945).

corporation." [3]  No claim for relief was filed relating to Component Famous Liquors, which had a fiscal year ending April 30.

The petitioner's first contention is that the excess profits tax of Component Gold Seal for the years ending January 31, 1941, and January 31, 1942, computed without the benefit of section 722, resulted in an excessive and discriminatory tax. It urges that there are four factors which qualify Component Gold Seal for relief under section 722 (b) (4), and that it has established that, for those 2 years, a fair and just amount representing normal earnings to be used as a constructive average base period net income is at least $141,635.

The respondent contends that even if it be assumed that one or more of the factors enumerated in section 722 (b) (4) occurred during the base period of Component Gold Seal, the petitioner is not entitled to relief because, even under assumed conditions, Component Gold Seal could not reasonably have been expected to make sufficiently higher earnings to overcome the "gap" between the credits under the average earnings method, and the credits actually used under the invested capital method.

Petitioner maintains that Component Gold Seal qualifies for relief under section 722 (b) (4) because it commenced business immediately prior to the base period and its average base period net income does not reflect normal operations for the entire base period. It

[3] I. R. C. 1939:

SEC. 740. DEFINITIONS.

For the purposes of this Supplement—

(a) ACQUIRING CORPORATION.—The term "acquiring corporation" means—

(1) A corporation which has acquired—

(A) substantially all the properties of another corporation and the whole or a part of the consideration for the transfer of such properties is the transfer to such other corporation of all the stock of all classes (except qualifying shares) of the corporation which has acquired such properties, or

(B) substantially all the properties of another corporation and the sole consideration for the transfer of such properties is the transfer to such other corporation of voting stock of the corporation which has acquired such properties, or

* * * * * * *

(4) A corporation the result of a statutory consolidation of two or more corporations,

(b) COMPONENT CORPORATION.—The term "component corporation" means—

(1) In the case of a transaction described in subsection (a) (1), the corporation which transferred the assets;

* * * * * * *

(4) In the case of a statutory consolidation, all corporations consolidated, except the corporation resulting from the consolidation;

* * * * * * *

(d) In the case of a taxpayer which is an acquiring corporation the base period shall be the four calendar years 1936 to 1939, both inclusive, except that, if the taxpayer became an acquiring corporation prior to September 1, 1940, the base period shall be the same as that applicable to its first taxable year ending in 1941.

(e) BASE PERIOD YEARS.—In the case of a taxpayer which is an acquiring corporation its base period years shall be the four successive twelve-month periods beginning on the same date as the beginning of its base period.

(f) EXISTENCE OF ACQUIRING CORPORATION.—For the purposes of section 712 (a), if any component corporation of the taxpayer was in existence before January 1, 1940, the taxpayer shall be considered to have been in existence before such date.

urges that if Component Gold Seal had started its operations 2 years earlier than it did the volume of sales attained at the close of its base period would have materially increased with resultant higher earning levels. Component Gold Seal commenced business on February 6 1934, following the repeal of the Eighteenth Amendment. Its base period began on February 1, 1936. Thus by the beginning of its base period it had engaged in business for a period of approximately 2 years. In order to receive the benefit of the 2-year "pushback" under section 722 (b) (4) it was incumbent upon the petitioner to show that the business of Component Gold Seal did not reach by the end of the base period the earning level which it would have reached if commencement of its business had been made 2 years before it actually was made. The business of Component Gold Seal was not one which required a long development period. Cf. *Midwest Liquor Dealers, Inc.*, 20 T. C. 950, 964. Its wholesale sales, which amounted to only $721,613 for the year ended January 31, 1935, and to $1,247,387 for the year ended January 31, 1936, rose to $2,051,262 for the year ended January 31, 1937, its first base period year. Its earnings for the latter year were higher than in any succeeding year except the last base period year which ended on January 31, 1940, even though the trend of its sales was to some extent upward. Our conclusion is that the petitioner has not shown that the commencement of the business of Component Gold Seal in 1934 resulted in its base period earnings being unrepresentative of normal earnings, and that it is not, therefore, entitled to relief by reason of the commencement factor.

As a second ground for relief, petitioner relies upon the change in the capacity for operation of the business of Component Gold Seal resulting from the acquisition of new facilities. In December 1937 Component Gold Seal acquired 60,000 square feet of space in a building located at 701–17 West Harrison Street, Chicago, Illinois, and during the same month exercised an option to purchase these new quarters for $40,000. The new quarters provided it with adequate space for its offices and salesrooms, and garage facilities, which it did not have before the move, and labor-saving devices were installed for the handling of its merchandise.

Petitioner contends that the change immediately created dollar savings on the existing volume of Component Gold Seal as a result of the elimination of garage rents and warehouse costs and the more effective handling of merchandise. While some savings may have accrued from these factors, the evidence does not convince us that they were substantial in amount as they are not reflected in the total amount of the deductions of Component Gold Seal before and after the change. If there had not been a decline in the salaries of offi-

cers and other executives during the fiscal year 1939, the percentage relation of deductions to wholesale sales would have been approximately the same during the base period years. This would indicate that any rental or warehousing costs which were eliminated by the acquisition of the Harrison Street building were largely offset by other costs incurred by Component Gold Seal as owner of these premises. About the only financial benefit we can find with confidence that it derived from the move is the income which it realized from renting the unused space in the new quarters to others. This rental amounted to $2,950 for the fiscal year 1939 and $4,250 for the fiscal year 1940.

Petitioner also contends that some savings accrued from the change to the new quarters when in January 1940 Component Gold Seal combined its operations with those of Famous. Prior to January 1940 Famous used Wakem & McLaughlin for the storage of its merchandise. While the evidence does not disclose the amount paid annually to the latter concern for storage, it does show that 10 cents per case was paid for the first month of storage and 5 cents per case per month thereafter, with a charge for withdrawals. It also shows that 2,447 barrels of Old Sunny Brook were bottled for Famous during the year 1939, and this indicates that approximately 36,705 cases (conversion rate of 15 cases per barrel) went in and out of the public warehouse. On this basis the petitioner has computed the storage costs to be not less than $3,670 for the first month and urges that to the extent the case goods were held in storage for longer than one month, the storage costs would exceed that amount. It also urges that Famous paid some undisclosed amounts for storing Lanson champagnes and other items, and the amounts shown in our findings to cartage companies for delivering its merchandise. While storage and cartage costs were eliminated in January 1940, insofar as Famous was concerned, any savings which accrued to the combined businesses cannot be ascertained by looking only at the amounts which Famous had been paying for storage and cartage prior to that time. Although Component Gold Seal thereafter stored the case goods on its premises and delivered them in its trucks, these services were not rendered without cost to it, and that cost cannot be overlooked in estimating any savings in storage and cartage costs which resulted from the move. These savings will be taken into consideration in connection with the relief which, as hereinafter noted, petitioner urges Component Gold Seal is entitled to receive by reason of the fact that its business was combined with that of Famous immediately prior to the end of its last base period year.

The remaining factors upon which petitioner relies for relief relate to the change in the management of the business of Component Gold

Seal in January 1940, and the absorption by it on that date of the sales personnel, inventory, and business of Famous. The respondent concedes that these changes occurred within the base period of Component Gold Seal and that they are factors which qualify it for consideration for relief under section 722 (b) (4). The petitioner contends that if these changes had been made 2 years prior to January 1940, Component Gold Seal would have reached a substantially higher level of earnings by the end of its base period.

In January 1940, Friedman, the president and principal stockholder of Famous, succeeded Clamage who had served as sales manager of Component Gold Seal for a period of approximately 2½ years. At that time Friedman had had considerable experience in the liquor business, and had served as president of Famous during the 3 base period years in which it was in business. During those years the earnings of the latter corporation steadily declined even though its sales volume increased. There is some evidence which indicates that some factors not of a managerial nature might have been partially responsible for this decline in earnings. Even assuming this to be true, however, an examination of the results of the operations of Famous during the base period years while managed by Friedman, and of the operations of Component Gold Seal during approximately the same period while managed by Clamage, does not convince us that the change in management alone, if effected 2 years prior to January 1940, would have resulted in any higher level of earnings for Component Gold Seal at the end of its base period. Our conclusion is that Component Gold Seal is not entitled to relief because of the change made in the management of its business in January 1940.

There remains the question as to the earning level Component Gold Seal would have reached at the end of its base period if the personnel, inventory, and business of Famous had been absorbed by it 2 years prior to January 1940. The record of Famous during the base period, when substantially all of its sales were of Old Sunny Brook, shows an increase in sales volume accompanied by a decline in earnings in each base period year in which it operated. The record of Component Gold Seal shows a trend of increased sales during the base period without a corresponding increase in earnings. The failure of the earnings of both corporations to keep pace with increased sales indicates that competition was severe and that profits were being sacrificed to get business. This condition would undoubtedly have been reflected in earnings of the last 2 base period years if the businesses of the two components had been combined in January 1938.

Despite the unimpressive record of Famous and Old Sunny Brook during 3 base period years, petitioner urges that if Component Gold Seal had acquired the business and personnel of Famous 2 years earlier than it did, it would have enjoyed substantially higher sales and earnings by the end of its base period. Some idea of its chances of achieving these favorable results may be gleaned from the experience of Component Gold Seal with the Englewood Wholesale Liquor Distributors, Inc. On June 26, 1937, Clamage, president of the latter corporation, liquidated that company and joined forces with Component Gold Seal. He brought six salesmen and some office personnel with him and became sales manager of Component Gold Seal. For the last fiscal year of its business (ended October 31, 1936), Englewood's sales were approximately $1,044,000. During the 12 months (July 1936 to June 1937) prior to acquiring the Englewood business, the wholesale sales of Component Gold Seal amounted to $2,372,811. During the 12 months following the combining of the two businesses (July 1937 to June 1938), its wholesale sales amounted to $3,006,283, an increase of $633,472. This increase was substantially less than the $1,044,000 of sales which Englewood had had in its last full year of operations. In the last full year of Component Gold Seal before combining with Englewood, when it had a net operating profit of $22,087, its wholesale transactions amounted to $2,051,000. For the year of acquisition ending January 31, 1938, its net operating profit declined to $20,161, even though its wholesale sales increased to $2,872,450. In the last base period year its sales increased to $3,086,529 and its net operating profit to $23,191. This profit was only slightly in excess of the net operating profit of $22,087 realized in the year ended January 31, 1937, prior to the acquisition of Englewood and its sales personnel.

In the light of the experience of Component Gold Seal after it acquired Englewood, we cannot share the optimism of witnesses for petitioner who expressed the opinion that its sales would have reached a volume of approximately $6,000,000 if it had acquired the business and sales personnel of Famous 2 years prior to January 1940. Neither can we share their optimism that its earnings would have reached a level of $141,635, $161,000, $222,500, or $227,960 by the end of its base period, after allowing to Famous an "override" of 35 cents per case on sales of Old Sunny Brook. The combined sales of the two components in the last base period year amounted to approximately $3,900,000, and their combined earnings (including a $7,000 income addition to Famous as an accounting adjustment) to approximately $33,000. We have carefully considered the evidence submitted by petitioner to establish that with 2 additional years of experience Component Gold Seal, with a sales force of 33 men selling

Old Sunny Brook and other items in the Component Gold Seal line of merchandise, and with some savings in overhead resulting from the combination, would have reached an earning level by the end of its base period of from $141,635 to $227,960. It does not convince us that one component, by absorbing the business and personnel of another component which had a base period record of increased sales and declining earnings, with Old Sunny Brook as its principal product, could reasonably anticipate by the end of its base period any substantial increase in the total earnings realized by the two components in their last base period years, even if the combination had occurred in January 1938. If it had, our best judgment is that although some increased sales might have been achieved by the end of the base period, any increase then reached in the earning level of the combined businesses would not be enough to give Component Gold Seal a constructive average base period net income sufficiently high to entitle it to a credit based upon such income in excess of the credits actually employed by it based upon invested capital for the years ended January 31, 1941, and January 31, 1942. We hold, therefore, that the respondent did not err in disallowing petitioner's claim for relief for those years. Cf. *Green Spring Dairy, Inc.*, 18 T. C. 217.

The parties have stipulated that Acquiring Gold Seal qualifies as an acquiring corporation under section 740 (a) (4) of the Internal Revenue Code of 1939; that Component Gold Seal and its subsidiary corporation, Famous, qualify as component corporations under section 740 (b) (4); and that for the years ended January 31, 1943 to 1946, inclusive, Acquiring Gold Seal is entitled to use the average base period net income computed under section 742 of the Code.

Petitioner's remaining contention is that the excess profits credit of Acquiring Gold Seal based upon the actual average base period net income of its component corporations is an inadequate standard of normal earnings, and that a fair and just amount representing normal earnings to be used as a constructive average base period net income for its fiscal years ending January 31, 1943 to 1946, inclusive, is $174,790.

For the purposes of section 722, Acquiring Gold Seal is deemed to be entitled to all of the qualifying factors for relief of its components. Its claim for relief for the years ending January 31, 1943 to 1946, inclusive, is based upon the same arguments advanced in support of its claim for relief relating to Component Gold Seal, with certain modifications necessary because of the consolidation effected on January 31, 1942. What we have heretofore said about the base period experience of its components need not be repeated. Suffice to say that that experience did not qualify Component Gold Seal for relief, and Acquiring Gold Seal had to overcome a much larger "gap" be-

tween credits based on average base period net income and credits based on invested capital in order to be entitled to relief. Giving effect to all of the evidence, the most favorable constructive average base period net income allowable would not be in excess of the credits actually used by petitioner based on invested capital. This circumstance distinguishes *Midwest Liquor Dealers, Inc.*, 20 T. C. 950, where some relief was allowed based on changes under section 722 (b) (4), somewhat comparable to the ones involved herein. We conclude, therefore, that the respondent did not err in disallowing petitioner's claim for relief under section 722 for the years ending January 31, 1943 to 1946, inclusive.

Reviewed by the Special Division.

*Decision will be entered for the respondent.*